# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

December 3, 2025

Lyle W. Cayce
Clerk

———————

No. 24-40463

———————

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

ULYSSES RUBALCAVA,

*Defendant—Appellant*.

————————————————————————

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 1:22-CR-111-1

————————————————————————

Before SMITH, STEWART, and HAYNES, *Circuit Judges*.

CARL E. STEWART, *Circuit Judge*:

In October 2023, Ulysses Rubalcava pleaded guilty to one count of possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B), and two counts of sexual exploitation of children, in violation of 18 U.S.C. § 2251(a). The district court sentenced him within the guidelines range to concurrent terms of 240 and 360 months of imprisonment, followed by a term of supervised release. The district court further imposed criminal monetary penalties and restitution in the total amount of $55,300. For the following reasons, we AFFIRM.

No. 24-40463

## I. FACTUAL & PROCEDURAL BACKGROUND[1]

In June 2021, Jazmine Rubalcava ("Jazmine") discovered her then-husband Rubalcava in the room of his eleven-year-old stepdaughter, Mary Doe, lying on his stomach between Mary's legs, attempting to pull her pants down. Jazmine confronted Rubalcava, searched his cellphone, and discovered multiple photographs of him sexually assaulting their eight-year-old daughter, Jane Doe. Rubalcava subsequently admitted that he had forced Jane to engage in oral and anal sex and that he had sexually assaulted both Jane and Mary in numerous ways. He also acknowledged that he had photographed both Jane and Mary naked and had videoed them engaging in sexual acts.

Jazmine alerted authorities and Rubalcava was arrested. A subsequent search of his cellphone and electronic devices revealed 194 images and one video depicting his sexual abuse of Jane and Mary. During a forensic interview, Mary recounted that Rubalcava's abuse began one or two years prior and that it occurred on a weekly basis. In her forensic interview, Jane reported that Rubalcava began abusing her at age five, forcing his penis into her genitals and mouth and inserting a pink toy into her genitals and anus. Jane further explained that Rubalcava recorded the sexual abuse of both her and Mary and forced them to watch the videos as well as other pornographic videos. Both Jane and Mary reported that the sexual abuse caused them physical pain and that they would always ask Rubalcava to stop but he would continue the abuse.

---

[1] The names of the minor victims involved in this appeal have been changed for their privacy protection. *See* 18 U.S.C. §§ 3509(a)(2), (d).

No. 24-40463

Rubalcava was charged with one count of possessing child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B) (Count one), and two counts of sexual exploitation of children, in violation of 18 U.S.C. § 2251(a) (Counts two and three). He pleaded guilty to the charges without the benefit of a plea agreement.

The Presentence Investigation Report ("PSR") determined that the combined total offense level for Rubalcava's counts of conviction, including several sentencing enhancements and a multi-count adjustment, was 50. His offense level was then reduced to 43 as the highest offense level available under the Guidelines. With a criminal history score of I, he faced a guidelines range of life imprisonment, reduced to the applicable statutory maximum sentences of 240 months on Count one and 360 months on Counts two and three.

Under the heading "Financial Condition: Ability to Pay," the PSR noted that Rubalcava had assets totaling $415,000. His assets included a vehicle worth $5,000, a residence valued at $287,848, and $122,152 in a trust account at Cadence Bank. According to the record, in 2003, when he was a minor, Rubalcava was injured in a car accident and subsequently awarded an unspecified amount of money as a result of an ensuing lawsuit. The money was then placed in a special needs trust account at Cadence Bank. The PSR further indicated that appraisal records listed the Cadence Bank NA Trustee as the registered owner of Rubalcava's residence, and that a financial records request was pending at Cadence Bank.

Rubalcava objected to the PSR on several grounds, including its findings related to his financial condition and ability to pay. He asserted that the assets listed were controlled by the committee of trustee officers at Cadence Bank and he had no authority over the funds in the court-ordered special needs trust account. The Probation Officer recommended that the

objection be overruled, explaining that the special needs trust account in question had been established in 2005 by court order, that Rubalcava was the primary beneficiary of the account, and that, pursuant to the order, he was entitled to recover all of the trust principal.

Upon receipt of the financial records requested from Cadence Bank, a revised PSR was prepared. The PSR explained that "[a]ccording to the statement period ending on September 30, 2023, the asset valuation of the special needs trust account managed by Cadence Asset Management and Trust bank was $458,364.40." The PSR further noted that "[a]ccording to financial records obtained from Cadence Asset Management and Trust bank, the market value cost of the residence is $230,000.00; therefore, the equity of the home is approximately $57,848.00." Rubalcava's total assets were listed as $521,211.40, reflecting the current balance of the trust account as $228,363.40.

At sentencing, the district court overruled Rubalcava's objections to the PSR's guidelines calculations, adopted the PSR's findings and conclusions, and sentenced him within the guidelines range to 240 months of imprisonment on Count one and 360 months on Counts two and three, to be served concurrently, followed by an eight-year term of supervised release. With respect to restitution and the financial assessments, the government acknowledged that there was an outstanding question as to whether the trust account funds could be considered as part of Rubalcava's financial resources and ability to pay. It then requested and received a continuance to research and submit a brief on the issue.

In its later-filed supplemental brief in support of its request for restitution, the government asserted that Rubalcava's child victims would incur reasonably foreseeable future losses for counseling necessitated by his criminal conduct. It included a victim impact statement that was provided by

Jazmine, describing how Rubalcava's conduct had affected Jane and Mary. It further submitted an estimate of the costs of such counseling from a local licensed therapist.

The government also requested that Rubalcava be ordered to pay an assessment under the Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018 ("AVAA")[2] in an unspecified amount not to exceed $50,000, in light of the factors set forth in 18 U.S.C. §§ 3553(a) and 3572. It attached an unsigned, unexecuted copy of the special needs trust account order ("the trust document"), establishing a spendthrift trust fund account for Rubalcava's sole benefit in 2004. The government acknowledged that the trust document provided that the trust assets could not be assigned by the beneficiary to others or otherwise attached in satisfaction of any debt or liability.

At the continued sentencing hearing, Rubalcava advised that, as part of his pending divorce settlement, he would have access to proceeds from the sale of his home. The district court found such proceeds relevant for purposes of the AVAA assessment and questioned whether the trust account funds could also be considered in determining the amount of that assessment. Rubalcava argued that the trust account funds could not be considered because he had no authority to compel the trustee to distribute any funds, no lien could attach to the trust principal, and there was no provision in the trust document compelling any annual or regular distributions—only distributions for his special needs as approved by the trustee in its discretion.

The district court ultimately determined that Rubalcava was not indigent and imposed a total of $55,300 in criminal monetary penalties. These included a $5,000 assessment per count of conviction under the

---

[2] *See* 18 U.S.C. § 2259A.

No. 24-40463

Justice for Victims of Trafficking Act of 2015 ($15,000 total),[3] and restitution in the amount of $5,000 per victim ($10,000 total)[4] for each victim's reasonably foreseeable future losses due to the offenses. The district court further concluded that a special assessment under the AVAA of $10,000 per count of conviction was warranted, for a total assessment of $30,000.[5] In imposing the $30,000 assessment under the AVAA, the district court stated that it did so upon considering the relevant statutory factors set forth in 18 U.S.C. §§ 3553(a) and 3572, specifically Rubalcava's financial resources, potential future earnings or lack thereof given the length of the sentence imposed, and the particularly serious nature of his offense.[6] Rubalcava filed this appeal.

## II. Discussion

On appeal, Rubalcava advances six challenges to his sentence. Specifically, he contends that the district court erred in (1) imposing restitution in the amount of $10,000; (2) imposing a special assessment under the AVAA in the amount of $30,000; (3) applying a four-point sentencing enhancement under U.S.S.G. § 2G2.1(b)(4)(A); (4) applying a four-point sentencing enhancement under U.S.S.G. § 2G2.1(b)(2)(B); (5) cross-referencing Count one under U.S.S.G. § 2G2.2(c)(1); and (6) due to its erroneous application of the sentencing enhancements and the cross-reference, it erred in calculating and imposing concurrent sentences of 240 and 360 months. We address each of his arguments in turn.

---

[3] *See* 18 U.S.C. § 3014.

[4] *See* 18 U.S.C. § 2259(a).

[5] *See* 18 U.S.C. § 2259A.

[6] The district court also imposed a $100 special assessment for each count ($300 total). *See* 18 U.S.C. § 3013.

*A. Restitution ($10,000)*

Rubalcava first argues that the district court erred in ordering him to pay restitution in the amount of $5,000 per victim for a total of $10,000 under 18 U.S.C. § 2259(a). He contends that the government failed to meet its burden of proof by providing the district court with record evidence showing the costs incurred or losses sustained by the victims as a result of his offenses.

We review the legality of the district court's restitution order de novo and its amount for abuse of discretion. *United States v. Villalobos*, 879 F.3d 169, 171–72 (5th Cir. 2018). Under 18 U.S.C. § 2259(a), a district court "shall order restitution for any offense under this chapter." Section 2259(b)(1) further provides that the order of restitution must cover "the full amount of the victim's losses" as determined by the court. "Losses under the statute comprise costs incurred for psychiatric and psychological care, rehabilitation, necessary transportation, lost income, attorneys' fees, and any other losses suffered by the victim as a proximate result of the offense." *Villalobos*, 879 F.3d at 171. It is the government's burden to prove "the amount of the loss sustained by [the] victim as a result of the offense." *Id.* (citing 18 U.S.C. § 3664(e); *see also* 18 U.S.C. § 2259(b)(2) (incorporating 18 U.S.C. §§ 3363A and 3664)). Although the district court's restitution order is not required to be exact, it "should represent an application of law, not a decisionmaker's caprice." *Id.* at 172 (citing *Paroline v. United States*, 572 U.S. 434, 461 (2014)). Once it determines the total amount of the victim's losses, "the court shall order restitution in an amount that reflects the defendant's relative role in the causal process that underlies the victim's losses, but which is no less than $3,000." 18 U.S.C. § 2259(b)(2)(B).

The district court held a sentencing hearing on restitution in June 2024. With respect to restitution under § 2259(a), the district court stated:

> Based on the victim impact statements, the nature of the crime as described in the PSR and the government's brief, I find that Mr. Rubalcava's conduct did cause, will continue to cause each of the victims to incur some form of loss. At the very least, in anticipated counseling because of the trauma that they have suffered. The question is whether there is evidence before the court to award more than the $3,000 minimum—minimum amount.

The district court then inquired whether the government could provide evidence justifying an award of restitution above the $3,000 minimum. The government responded that it did not have "any bills or receipts of therapy" that the mother had paid on behalf of the victims because they were currently reluctant to revisit the trauma of the sexual abuse they endured through therapy or counseling. Nevertheless, the government averred that it would be "inevitable" for the children "to need some therapy in the future" so they could "learn how to cope with their new reality." In support of this argument, the government referenced the memorandum it had filed in advance of the restitution hearing from the local licensed professional counselor recommending that both minors receive long-term therapy given the facts of the case. Therein, it provided the counselor's estimate of the frequency and cost of the counseling sessions explaining that each minor would likely need an hour of counseling per week for the first year and biweekly thereafter at a weekly rate of $120 per hour. Based on this calculation the counselor projected that the minors would incur future losses of $9,360 each for a total of $18,720 for both minors. Upon considering the government's arguments, the district court agreed that a restitution award exceeding the minimum amount of $3,000 per victim was appropriate. In support of its conclusion, the district court explained:

> At the end of the day, based on the full record and the—the reasonable inferences that I make about the need for each of the victims to undergo therapy and counselling in the future,

8

> medications that may be involved with any form of treatment, I find that an award of $5,000 in restitution per victim for each of the two victims is an appropriate award.

We agree that the district court's restitution award of $5,000 per victim is adequately supported by the evidence presented by the government. As the record reflects, the government provided evidence in the form of a detailed memorandum from a local licensed professional counselor that allowed the district court to estimate the losses that were "reasonably projected to be incurred by the victim[s]" as a result of Rubalcava's conduct. 18 U.S.C. § 2259(b)(2)(A) ("The court shall determine the full amount of the victim's losses that were incurred or are reasonably projected to be incurred by the victim as a result of the trafficking in child pornography depicting the victim."). The district court then relied on that evidence, along with the victim impact statements and the information in the PSR regarding the nature of the crime to calculate a conservative estimate of both victims' projected losses in the form of future counseling and treatment costs. As this court has recently acknowledged in the context of restitution, the government is tasked with the "burden of providing the court with enough evidence to estimate the victim's losses with some reasonable certainty." *United States v. Etheridge*, No. 22-40516, 2023 WL 5347294, at *4 (5th Cir. Aug. 21, 2023) (citing *United States v. Reese*, 998 F.2d 1275, 1282–84 (5th Cir. 1993)); *see also Villalobos*, 879 F.3d at 172 (the district court's restitution order "need not be exact"). The government has done so here. Accordingly, we affirm the district court's $10,000 restitution award issued under 18 U.S.C. § 2259(a).

### B. AVAA Assessment ($30,000)

At the continued sentencing hearing, the district court heard arguments from both Rubalcava and the government pertaining to whether it should impose an assessment under the AVAA, and if so, in what amount.

Arguing in favor of the assessment, the government pointed to Rubalcava's various financial resources which included his home, his vehicle, and the special needs trust that had been established for him at Cadence Bank. Rubalcava countered that the trust should not be considered as a financial resource because he did not have unconditional control over the trust funds. Upon considering the parties' arguments and affording Rubalcava an opportunity to allocute, the district court stated:

> I do look at the factors in 3553(a) and 3572, so I am considering your income and financial resources, Mr. Rubalcava, your potential for future earnings or the lack thereof given the length of the prison sentence but I also am considering the nature of the crime and the quite serious nature of—of the crime and the other factors in Section 3553(a). Based on all these factors, I impose a special assessment of $10,000 per count under 18 U.S.C. 2259(A) due instanter for a total of $30,000 which, when combined with the other awards or other restitution, special assessments that I have made, I think totals $55,300 if my calculation is correct.

On appeal, Rubalcava contends that the district court erred in imposing the $30,000 assessment under the AVAA. He argues that in doing so, the district court mistakenly applied the relevant statutory factors, particularly his income and financial resources. According to Rubalcava, he does not own the trust account, and he has no right to any of the funds or assets in the trust until it has been irrevocably and unconditionally placed in his control. He further contends that any notion from the court that the AVAA assessment could be paid from the funds of the trust would be in violation of the terms of the trust itself. Thus, it is his position that the district court erred in considering the trust as a financial resource available to him when it imposed the $30,000 assessment under the AVAA.

No. 24-40463

The government counters that the record is insufficient to establish that any trust exists, noting that the only trust document in the record is unsigned and there is no evidence that it was ever filed. It further points out that, even if a valid trust document was executed, the terms of the trust appear to mandate that it automatically dissolved, with all remaining funds to be transferred to Rubalcava, when he turned twenty-five.[7] Alternatively, the government asserts that the district court did not err in considering the trust fund account as a financial resource because Rubalcava was the primary beneficiary of the trust, and the fact that the assets were not liquid did not shield them from consideration as a financial resource. The government further contends that Rubalcava's argument is misplaced that the district court cannot penetrate the trust or mandate payment from the trust because the court did no such thing. Rather, it merely considered the trust account as one of Rubalcava's financial resources under 18 U.S.C. § 3572.[8]

For preserved challenges to the imposition of a special assessment, we review the district court's factual findings for clear error and questions of law de novo. *United States v. Barrera*, No. 23-50043, 2024 WL 957480, at *3 (5th

---

[7] Rubalcava was born on July 5, 1989, and turned twenty-five on July 5, 2014.

[8] The government draws our attention to a Fourth Circuit case, *United States v. Gresham*, 964 F.2d 1426, 1427–30 (4th Cir. 1992), wherein a defendant convicted of insurance fraud argued that the district court could not consider, in assessing the § 3572 factors for purposes of determining the appropriate fine, a home he co-owned with his wife because the government would not be able to enforce a judgment lien against the home under Maryland law. The *Gresham* court rejected the defendant's argument, concluding that regardless of whether the government would be entitled to the defendant's interest in proceeds from the sale of the jointly owned residence, his interest in the residence was a "financial resource" that the court could validly consider under § 3572(a)(1) for purposes of determining a fine as part of his criminal penalty for his offense. *Id.* at 1430. The court explained that "[t]he government's inability to collect a fine from a defendant because of the defendant's inability to transfer an asset in payment of the fine does not affect the legitimacy of the fine." *Id.* According to the government, the same logic should apply to the AVAA assessment here.

Cir. Mar. 6, 2024) (citing *United States v. Graves*, 908 F.3d 137, 140 (5th Cir. 2018)). "A factual finding will be deemed clearly erroneous if, based on the record as a whole, this court is left with the definite and firm conviction that a mistake has been committed." *United States v. Odom*, 694 F.3d 544, 547 (5th Cir. 2012) (cleaned up). "There is no clear error if the district court's finding is plausible in light of the record as a whole." *Id.*

The AVAA mandates that, in addition to "any other criminal penalty, restitution, or special assessment," the district court is required to assess "not more than $17,000 on any person convicted of an offense under . . . [§] 2252A(a)(5)," and "not more than $50,000 on any person convicted of a child pornography production offense." 18 U.S.C. § 2259A(a)(1), (3). "Special assessments paid pursuant to Section 2259A do not go to a specific victim but rather are deposited and pooled in the 'Child Pornography Victims Reserve' established in 18 U.S.C. § 2259B." *United States v. Madrid*, 978 F.3d 201, 206 (5th Cir. 2020). Consequently, such assessments do not require proof of a victim or of a victim's losses. *Id.* Instead, to determine the amount of the assessment, the district court "shall consider the factors set forth in [§§] 3553(a) and 3572." § 2259A(c).

Section 3353(a) sets out the factors that a sentencing court is to consider in determining an appropriate sentence in every case, including the nature and circumstances of the offense, the defendant's history and characteristics, the need to provide just punishment, and the need for adequate deterrence and public protection. 18 U.S.C. § 3553(a)(1), (a)(2). Section 3572 in turn lists the factors to be considered in determining matters related to the imposition of a fine, including the defendant's income and financial resources, the burden the fine will impose on the defendant,

whether restitution has been ordered, and the amount of such restitution.[9] 18 U.S.C. § 3572(a).

As an initial matter, we note that at the continued sentencing hearing Rubalcava stated that his residence was being sold as part of his pending divorce proceedings and that "the sale of the home that [Rubalcava and Jazmine] shared potentially could act as resolution of what it is that the government seeks the court to impose in this case." In response, the district court reasoned that "the interest of Mr. Rubalcava in the home, the potential sale of the home certainly bears relevance[,] and I can consider that amount or—or those potential resources to determine what is the right—what is the appropriate special assessment." Based on Rubalcava's statements indicating that the proceeds of the sale of his marital home could likely be used to satisfy his criminal monetary penalties, and the PSR's note that the equity of the home is approximately $57,848, we conclude that the district court did not err in considering his residence as a financial resource for purposes of the AVAA assessment. *See* 18 U.S.C. §§ 3572, 2259A.

Turning to the issue of the special needs trust, we agree that it is not clear from the record if the terms of the original trust are still in effect. However, we assume *arguendo* that the trust still exists as Rubalcava asserts on appeal. At the original sentencing hearing, Rubalcava's counsel stated:

> My understanding of the trust, Your Honor, and how that it works is it is for the benefit of Ulysses Rubalcava and for no one else. There is—submissions have to be made to the special needs trust, there is a group or a committee. . . . [T]he trust is set aside for Mr. Rubalcava's needs. Now, historically, when Mr. Rubalcava reached the age of maturity and after getting

---

[9] Section 3572 further directs that any monetary penalty assessed should not impair the defendant's ability to make restitution to the victims of the offense. 18 U.S.C. § 3572(b).

> married, he did make requests of the trust for things such as a van for his family, which his family still uses today; a home for his family, which his family still has access to or uses as a result of—of—of everything that has occurred.
>
> * * *
>
> Obviously it's something for the court to consider. . . . There is a special needs trust set aside for special needs that require his—for his benefit and not for fines as—as sought by the government.

Similarly, at the continued sentencing hearing, Rubalcava's counsel stated that "[e]very time money is distributed from that trust, it has to go before the trustee; the trustee has to approve it that in fact it is for some special need that qualifies."

In viewing counsel's statements at both sentencing hearings, it is clear that the thrust of Rubalcava's argument is that the trust is only for his personal benefit—not for the benefit of a creditor or, in this particular instance, for payment of restitution or an assessment under the AVAA. Even if true, his argument still does not speak to whether the district court could consider the trust as a financial resource. To be sure, counsel's statements at both sentencing hearings make three points clear: (1) Rubalcava has made requests for funds from the trust in the past; (2) those requests have been approved by the trustee; and (3) funds have been distributed to him from the trust based on those requests. Whether the government can directly obtain funds from the trust is irrelevant to our inquiry. The government has emphasized that it is not attempting to impose a lien on the trust or siphon funds directly from the trust for payment of Rubalcava's criminal monetary penalties. Indeed, as it argues on appeal, it is not convinced that the trust even presently exists.

No. 24-40463

What the government does argue, however, is that the district court was within bounds to consider the trust as one of Rubalcava's financial resources, in addition to the value of his home and his vehicle, for purposes of determining his ability to pay the AVAA assessment. The district court's consideration of the trust as part of Rubalcava's financial picture is supported by his statements at the sentencing hearings. As counsel repeatedly explained at sentencing, the trust is "for the benefit of Ulysses Rubalcava," the trust is "set aside for Mr. Rubalcava's needs," and funds have been consistently distributed from the trust in accordance with his various requests, including but not limited to, funds for at least one residence and one vehicle. The fact that a creditor may not be authorized to place a lien on the trust or directly obtain funds from it for the payment of fines has no bearing on whether the trust is a financial resource to Rubalcava. And as his counsel emphasized at both sentencing hearings, the trust is exactly that—a financial resource intended for Rubalcava's sole benefit.[10]

In sum, when viewed in the context of the record as a whole, including Rubalcava's statements at sentencing, we conclude that the district court did not clearly err in considering the trust as a financial resource under 18 U.S.C. § 3572. Even if the district court did clearly err in considering the trust as a financial resource, the equity from the proceeds of the sale of his home

---

[10] In support of his argument that the district court erred in effectively directing payments from the trust by ordering a $30,000 AVAA assessment, Rubalcava cites *In re Bass*, 171 F.3d 1016, 1026–30 (5th Cir. 1999). There, this court held that the district court erred in granting an injunction directing trustees of a spendthrift trust to furnish creditors in a bankruptcy proceeding with advance notice of distributions to a beneficiary for purposes of debt collection because the court could not interfere with the trustees' free exercise of their discretion in making distributions under the trust. *Id.* at 1030–31. However, as the government correctly points out, that case has no bearing on the question of whether a district court may consider trust account funds to which the defendant is the sole beneficiary as financial resources for purposes of determining the appropriate amount of an AVAA assessment. *See id.*

($57,848) and the value of his vehicle ($5,000) are sufficient to support the AVAA assessment, in addition to his other criminal monetary penalties which altogether total $55,300. Thus, the district court's imposition of the AVAA assessment does not leave us with "the definite and firm conviction that a mistake has been committed." *See Odom*, 694 F.3d at 547. For these reasons, we hold that the district court did not clearly err in imposing the $30,000 AVAA assessment. *See* 18 U.S.C. §§ 3572, 2259A.

### C. Sentencing Enhancements & Duration of Sentence

We now turn to Rubalcava's arguments pertaining to the district court's calculation of the length of his sentence under the Guidelines. He contends that the district court erred in applying a four-point sentencing enhancement under U.S.S.G. § 2G2.1(b)(4)(A), a four-point sentencing enhancement under U.S.S.G. § 2G2.1(b)(2)(B), and in cross-referencing Count one under U.S.S.G. § 2G2.2(c)(1). He argues that based on these errors, the district court miscalculated his sentence under the Guidelines by seven offense levels and thus abused its discretion in imposing concurrent sentences of 240 and 360 months. Nevertheless, he concedes that even without the enhancements that he perceives are erroneous, his corrected offense level of 44 would still result in a guidelines range of life.

The government counters that the record supports the district court's application of both sentencing enhancements, as well as the cross-reference in Count one. Moreover, even if the enhancements or cross-reference resulted in an error to its calculation of Rubalcava's sentence under the Guidelines, any error was harmless. This is because even without the sentencing enhancements and the cross-reference, Rubalcava's sentence would not change, *i.e.*, it would still result in a guidelines range of life. Thus, he cannot show that his substantial rights were affected resulting in reversible error.

*1. Sentencing Enhancement Under U.S.S.G. § 2G2.1(b)(4)(A)*

We first address Rubalcava's contention that the district court erred in applying the enhancement under section 2G2.1(b)(4)(A) "because there is no evidence that [he] obtained a sexual release through the infliction of physical or emotional pain on another that is contemporaneous with the creation of pornographic material involving minors." Rubalcava preserved his objection to the application of this sentencing enhancement, so in considering whether the district court properly applied it, we review its "interpretation of the Sentencing Guidelines de novo and its factual determinations for clear error." *United States v. Hernandez*, 48 F.4th 367, 372 (5th Cir. 2022) (quoting *United States v. Garza*, 587 F.3d 304, 308 (5th Cir. 2009)).

A four-level sentencing enhancement under section 2G2.1(b)(4)(A) applies when the "offense involved material that portrays . . . sadistic or masochistic conduct or other depictions of violence." This court has held that for the enhancement to apply, the image must "depict[ ] conduct that an objective observer would perceive as causing the victim in the image physical or emotional pain contemporaneously with the image's creation." *United States v. McGavitt*, 28 F.4th 571, 575 (5th Cir. 2022) (quoting *United States v. Nesmith*, 866 F.3d 677, 681 (5th Cir. 2017)). "Our objective-observer inquiry focuses on an observer's view of the image—what is portrayed and depicted—rather than the viewpoint of either the defendant or the victim." *Id.* (cleaned up).

We have determined in previous cases that the enhancement "is warranted when the sexual act depicted is likely to cause pain in one so young." *Id.* (quoting *United States v. Lyckman*, 235 F.3d 234, 238 (5th Cir. 2000)). We have also upheld the enhancement in cases involving images "showing anal and vaginal penetration of minors through the use of sexual

devices," as well as images "depict[ing] the physical penetration of a young child by an adult male." *Id.* (quoting *United States v. Canada*, 110 F.3d 260, 264 (5th Cir. 1997) (per curiam); *Lyckman*, 235 F.3d at 240). Likewise, we have "upheld application of the enhancement where a young child was forced to orally copulate a parent on grounds that such conduct would humiliate and degrade the victim." *Id.* (citations omitted).

The circumstances in this case closely resemble those in the above cases where this court has upheld the enhancement. As the record indicates, Rubalcava's two victims were very young. His daughter Jane was only eight years old when he was apprehended and according to her forensic interview in the PSR, she was likely five years old when the abuse began. Likewise, his stepdaughter Mary was only eleven years old when he was apprehended and approximately nine or ten years old when the abuse began. Both children were forced to perform oral sex on the defendant, both children were raped by the defendant, and both children were forced to endure the use of penetration from a sexual device used by the defendant, oftentimes while being photographed or videoed. Moreover, both children stated that they experienced pain during all of these sexual encounters but that they could not stop Rubalcava from continuing the abuse.

Based on this prior case law, there is little question that the district court's application of the enhancement under section 2G2.1(b)(4)(A) was warranted in this case and we uphold it accordingly.

*2. Sentencing Enhancement Under U.S.S.G. 2G2.1(b)(2)(B)*

Rubalcava next contends that the district court erred in applying a sentencing enhancement under section 2G2.1(b)(2)(B) "because there is no evidence to suggest that weapons or force were used against the victims, that they were placed in fear of or threatened with death, serious bodily injury, or kidnapping, or that a drug or other substance was used to render them

unconscious or impair their ability to appraise or control the conduct." Because he failed to object to the application of this enhancement in the district court proceedings, we review his unpreserved claim for plain error. *McGavitt*, 28 F.4th at 576. Under the plain error standard of review:

> (1) there must be an error; (2) the error must be clear or obvious, rather than subject to reasonable dispute; (3) the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it 'affected the outcome of the district court proceedings'; and (4) the court must decide in its discretion to correct the error because it seriously affects the fairness, integrity or public reputation of judicial proceedings.

*Id.* at 575 (quoting *United States v. McClaren*, 13 F.4th 386, 413 (5th Cir. 2021)).

Section 2G2.1(b)(2)(B) provides that "[i]f the offense involved . . . the commission of a sexual act; and (ii) conduct described in 18 U.S.C. § 2241(a) or (b), increase by 4 levels." In turn, section 2241(a) states that:

> Whoever . . . knowingly causes another person to engage in a sexual act—(1) by using force against that other person; or (2) by threatening or placing that other person in fear that any person will be subjected to death, serious bodily injury, or kidnapping; or attempts to do so, shall be fined under this title, imprisoned for any term of years or life, or both.

"A defendant uses force within the meaning of § 2241 when he employs restraint sufficient to prevent the victim from escaping the sexual conduct." *United States v. Simmons*, 470 F.3d 1115, 1121 (5th Cir. 2006) (quoting *United States v. Lucas*, 157 F.3d 998, 1002 (5th Cir. 1998)). "Such force can be 'implied from a disparity in size and coercive power between the defendant and his victim.'" *Id.*

No. 24-40463

Again, the record clearly supports the district court's application of this enhancement. As the government points out, at Rubalcava's re-arraignment, the district court directed the prosecutor to present the facts that she was prepared to prove at trial. The prosecutor responded by recounting the information obtained during the forensic interviews with both children. She cited Mary and Jane's statements that Rubalcava "forced" them to perform oral sex on him and Jane's statement that he "forced" her to watch pornographic videos as well as videos of Rubalcava raping Mary. After these and other similar facts related to his abuse were read into the record, the district court asked Rubalcava, "Are those facts true?" to which he responded, "Yes, Your Honor." Additionally, both children indicated during their forensic interviews that when they asked Rubalcava to stop the abuse, he ignored their pleas. Mary additionally stated that he "would grab her head back and forth" while forcing her to engage in oral sex, further supporting that neither Mary nor Jane had the ability to stop the abuse and were thus forced by Rubalcava to endure it. And as this court has held, force can be implied from the "disparity in size and coercive power" between Rubalcava and his two child victims. *Id*. at 1121.

Given this record evidence, we hold that the district court did not plainly err in applying the enhancement under section 2G2.1(b)(2)(B) on grounds that Rubalcava used force in perpetrating the abuse against Jane and Mary as described under section 2241(a). *See id*.

### 3. Cross-Reference Under U.S.S.G. § 2G2.2(c)(1)

Rubalcava further argues that the district court erred in applying the cross-reference under section 2G2.2(c)(1) because it "failed to make an inquiry into [his] purpose or intent when photographing the alleged victims." Because he failed to object to the application of this cross-reference, our review is for plain error. *McGavitt*, 28 F.4th at 576.

20

Section 2G2.2(c)(1) is a cross-reference under the Guidelines that provides that "[i]f the offense involved causing, transporting, permitting, or offering or seeking by notice or advertisement, a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct . . . apply § 2G2.1." As explained in the PSR, upon applying § 2G2.1(a), Rubalcava's base offense level was 32.

Once again, the record clearly supports application of the cross-reference. As the government notes, at re-arraignment the prosecutor read aloud the grand jury charges on Counts two and three which included a statement that Rubalcava had engaged in the sexual abuse against his children "for the purpose of producing a visual depiction of such conduct" and Rubalcava verbally responded that he was guilty of the conduct that the prosecutor had described. Additionally, as the PSR details, Rubalcava admitted in his interview with law enforcement:

> that he had performed oral sex on both Jane and Mary Doe and that he had photographed both of his naked daughters with his Samsung Galaxy S20 cellular telephone and transferred the images to his desktop computer where he would create folders to view them later. . . . [and] the evidence found on his cellular telephone depicted Jane Doe performing sexual acts to him.

Accordingly, Rubalcava's own statements in the record support the district court's application of the cross-reference under section 2G2.2. Prior decisions of this court do as well. *See United States v. Caudill*, 427 F. App'x 301, 302 (5th Cir. 2011) (per curiam) (upholding the district court's application of the enhancement when the defendant took illicit photographs of the victim while touching her vagina, causing harm).

No. 24-40463

Consequently, we hold that Rubalcava has failed to show that the district court plainly erred in applying the cross-reference under section 2G2.2(c)(1).[11]

### III. Conclusion

For the foregoing reasons, we AFFIRM Rubalcava's sentence in full.

---

[11] In light of our above holdings affirming the district court's application of the sentencing enhancements under sections 2G2.1(b)(4)(A) and 2G2.1(b)(2)(B), as well as its application of the cross-reference under section 2G2.2(c)(1), we need not address Rubalcava's final argument that the district court's improper application of the sentencing enhancements and cross-reference caused it to miscalculate his sentence under the Guidelines by seven offense levels resulting in its erroneous imposition of concurrent sentences of 240 and 360 months. Assuming *arguendo* that Rubalcava's arguments related to the enhancements have merit, we nevertheless acknowledge and agree with his concession that even without the enhancements, his corrected offense level would still result in a guidelines range of life. Thus, he cannot show reversible error. *See United States v. Randall*, 924 F.3d 790, 795 (5th Cir. 2019) (reasoning that even if an error in a Sentencing Guidelines calculation is established, "such error shall nevertheless be disregarded if it is harmless, *i.e.*, if it does not affect substantial rights" (quoting FED. R. CRIM. P. 52(a))).